# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION (CINCINNATI)

| | |
|---|---|
| ANITA KARLSSON ) <br> 219 Washington Way ) <br> Mason, OH 45040 ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CARGO AIRCRAFT MANAGEMENT, INC. ) <br> 145 Hunter Dr. ) <br> Wilmington, OH 45177 ) <br> ) <br> **Serve Also:** ) <br> Cargo Aircraft Management, Inc. ) <br> c/o Corp. Service Co. (Stat. Agent) ) <br> 50 West Broad Street, Suite 1330 ) <br> Columbus, OH 43215 ) <br> ) <br> -and- ) <br> ) <br> JONATHAN SWETNAM ) <br> c/o Cargo Aircraft Management, Inc. ) <br> 145 Hunter Dr. ) <br> Wilmington, OH 45177 ) <br> ) <br> -and- ) <br> ) <br> BRADY TEMPLETON ) <br> c/o Cargo Aircraft Management, Inc. ) <br> 145 Hunter Dr. ) <br> Wilmington, OH 45177 ) <br> ) <br> ) <br> Defendants. ) <br> ) | CASE NO. <br><br> JUDGE: <br><br><br><br><br><br><br><br><br> **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** <br><br> **JURY DEMAND ENDORSED HEREIN** |

Plaintiff ANITA KARLSSON by and through undersigned counsel, as her Complaint against the Defendants, states and avers the following:

## **PARTIES**

1. Plaintiff Anita Karlsson is a resident of the city of Mason, Warren County, state of Ohio.

2. Defendant CARGO AIRCRAFT MANAGEMENT, INC. ("CAM") is a foreign-incorporated company that conducts business within the state. The relevant location of the events and omissions of this Complaint took place was 145 Hunter Dr., Wilmington, OH 45177.

3. CAM is, and was at all times hereinafter mentioned, Karlsson's employer within the meaning of Family and Medical Leave Act ("FMLA") 29 U.S.C. § 2617 et seq., R.C. § 4101 et seq., and R.C. § 4112.01(A)(2).

4. Upon information and belief, Defendant JONATHAN SWETNAM ("Swetnam") is a resident of the state of Ohio.

5. Defendant Swetnam is and/or was an employee of CAM.

6. Defendant Swetnam did, and at all times hereinafter mentioned, acted directly or indirectly in the interest of CAM and/or within the scope of his employment at CAM.

7. At all relevant times referenced herein, Defendant Swetnam supervised and/or controlled Karlsson's employment at CAM.

8. At all times referenced herein, Defendant Swetnam was Karlsson's employer within the meaning of the FMLA and R.C. 4112.01(A)(2).

9. Upon information and belief, Defendant BRADY TEMPLETON ("Templeton") is a resident of the state of Ohio.

10. Defendant Templeton is and/or was an employee of CAM. Templeton was the President of CAM.

11. Defendant Templeton did, and at all times hereinafter mentioned, acted directly or indirectly in the interest of CAM and/or within the scope of his employment at CAM.

12. At all relevant times referenced herein, Defendant Templeton supervised and/or controlled Karlsson's employment at CAM.

13. At all times referenced herein, Defendant Templeton was Karlsson's employer within the meaning of the FMLA and R.C. 4112.01(A)(2).

## JURISDICTION & VENUE

14. The events that give rise to the claims for relief in this Complaint occurred at Bridgeport's location at 145 Hunter Dr., Wilmington, OH 45177.

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that Hightower is alleging a federal law claim under the FMLA.

16. This Court has supplemental jurisdiction over Hightower's state law claims pursuant to 28 U.S.C. § 1367, as they are so closely related to their federal law claims that they form part of the same case and controversy under Article III of the United States Constitution.

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

## FACTS

18. Karlsson is a former employee of CAM.

19. At all times noted herein, Karlsson was qualified for her position with CAM.

20. At all times noted herein, Karlsson could fully perform the essential functions of her job, with or without a reasonable accommodation.

21. Karlsson is in a protected class for disability by association due to her child's cancer diagnosis (*infra*).

22. Karlsson worked for CAM as an asset manager from April 1, 2020 until Defendants terminated her employment on or about March 9, 2021.

23. Karlsson was a fantastic performer for CAM and had zero issues with attendance and completion of her work despite needing to work from home due to her child's diagnosis.

24. Karlsson was initially headhunted to CAM after a previous layoff from General Electric.

25. From early on in her employment, Karlsson faced issues with disparate treatment due to her sex/gender.

26. Karlsson manager, Defendant Swetnam, often yelled out his door for Karlsson, rather than calling, emailing, or otherwise reaching out to her, to assign her tasks.

27. Karlsson did not yell for male subordinates to assign them tasks.

28. Swetnam also bullied Karlsson by, among other things, consistently speaking condescendingly to her.

29. Disparately, Swetnam did not speak down to his male subordinates.

30. Karlsson, as part of her role, would suggest her best opinion on certain tasks and how to complete them.

31. Swetnam ignored Karlsson's suggestions as they came from a woman.

32. As an example of how Karlsson knew this, she had suggested to scope out an engine prior to sending it to CAM's customer, but Swetnam refused to do so.

33. Karlsson then asked Brian DuFour (vice president with a sister company) to recommend the exact same idea to Swetnam.

34. After DuFour made the exact same suggestion as Karlsson, Swetnam agreed it was the smart move and instructed Karlsson to do so.

35. In or around August 2020, Karlsson fell ill with a sinus infection.

36. After evaluating with her doctors, Karlsson tested negative for COVID-19.

37. Swetnam harassed Karlsson for updates on the COVID-19 test near-daily while she awaited its results.

38. Shortly after, Karlsson's child also fell ill, but the child's illness would not subside over time.

39. After more than one month of testing and evaluation (on or about September 29, 2020), Karlsson's child was diagnosed with cancer, placing Karlsson in the protected class for disability by association.

40. Karlsson immediately gave notice of her child's cancer to Defendants after the diagnosis.

41. Karlsson then spoke with Steve Sager (HR), to discuss Karlsson's next steps.

42. Karlsson mentioned she needed to begin working from home so she could help her child and continue her employment.

43. Sager told Karlsson that she was not yet eligible for FMLA as she had not worked the requisite one-year timeline, but that she would become eligible later.

44. Through the remainder of her employment, Karlsson continued to work from home for Defendants, often working more than twelve hours per day. She continued to have zero performance issues.

45. In or around mid-January 2020, Karlsson's child also tested positive for the COVID-19 virus, which was likely contracted while in the hospital.

46. Karlsson thus had to quarantine as a result and informed Defendants of the quarantine.

47. Over the next several months, Karlsson continued to keep Defendants informed of her child's condition via letter directly from her child's treating hospital. Approximately four letters were sent over that timeline.

48. Additionally, Karlsson was in near-daily talks with Swetnam and HR about her in-person return timeline.

49. Despite the constant updates on her child's condition, Swetnam continued to harass Karlsson about the timeline to return to her in-person.

50. Karlsson, tired of Swetnam's constant harassment of her for her child's disabilities (and thus her time working remote), complained to CAM that she felt was being discriminated against due to her child's disabilities. This was a protected complaint.

51. Despite working remotely, Karlsson continued to perform well in her role.

52. On or about March 9, 2020, Karlsson spoke with Sager again about her expected in-person return.

53. After discussing further, Sager commented that it seemed Karlsson and her child had a "long road ahead of [them]" for recovery as the treatments were not working as hoped or expected.

54. Sager told Karlsson that Swetnam wanted someone in-person, rather than remote, working in her role, and thus Swetnam had chosen to terminate her employment to "allow [Karlsson] to focus on [her child's] health" rather than continuing to work.

55. Throughout the entirety of Karlsson's issues with her child's cancer and her problems at work, Defendant Templeton was kept informed of the situation.

56. Karlsson also specifically reached out to Templeton on multiple occasions in order to further discuss her concerns with workplace discrimination because of her child's diagnosis.

57. Defendants effectively told Karlsson that, despite that she had zero performance or attendance issues even when working remote, that Karlsson was not at work in-person

often enough because of her child's health, and so they did not want to continue to employ her.

58. Thus, Karlsson's termination was almost-explicitly terminated citing her child's disabilities.

59. Upon information and belief, both Templeton and Swetnam were the decision-makers to terminate Karlsson's employment.

60. On or about March 9, 2020, Defendants sent Karlsson a severance offer terminating her employment.

61. Defendants did not cite any reason for this termination in this severance offer.

62. Defendants' termination of Karlsson was an adverse employment action against her.

63. Defendants' purported reasons (or lack thereof) for Karlsson's termination was pretextual.

64. Defendants actually terminated Karlsson's employment discriminatorily against her child's disabilities, in retaliation against her protected complaints, and/or in a preventative effort against her FMLA.

65. As a result of the above, Karlsson has suffered damages.

**COUNT I: DISABILITY DISCRIMINATION IN VIOLATION OF R.C. § 4112, *et seq*.**

66. Karlsson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

67. Karlsson is in a protected class for her child's disabilities (described *supra*).

68. R.C. § 4112 *et seq*. provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's (or their close associate's) disabilities.

69. Defendants treated Karlsson differently than other similarly situated employees based upon her and/or her close associate's disabilities.

70. Defendants violated R.C. § 4112.02 and R.C. § 4112.99 by treating Karlsson differently from other similarly situated employees outside her protected class.

71. Defendants violated R.C. § 4112.02 and R.C. § 4112.99 by applying their employment policies in a disparate manner based on Karlsson's and/or her close associate's disability.

72. Defendants violated R.C. § 4112.02 and R.C. § 4112.99 by applying their disciplinary policies in a disparate manner based on Karlsson's and/or her close associate's disability.

73. Karlsson incurred emotional distress damages as a result of Defendants' conduct described herein.

74. As a direct and proximate result of Defendants' acts and omissions, Karlsson has suffered and will continue to suffer damages.

**COUNT II: SEX/GENDER DISCRIMINATION IN VIOLATION OF R.C. 4112 et seq.**

75. Karlsson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

76. Karlsson is a member of a statutorily protected class based on her sex/gender under R.C. § 4112 et seq.

77. Defendants treated Karlsson differently than other similarly situated employees based on her sex/gender.

78. Defendants discriminated against Karlsson on the basis of her sex/gender throughout the end of her employment with the company.

79. Defendants terminated Karlsson's employment.

80. Defendants' termination of Karlsson was an adverse employment action against her.

81. Defendants' cited reason(s) for Karlsson's termination are pretextual.

82. Defendants actually terminated Karlsson because of her sex/gender.

83. Defendants violated R.C. § 4112 et seq. when tey terminated Karlsson's employment based on her sex/gender.

84. Defendants' discrimination against Karlsson based on her sex/gender violates R.C. § 4112 et seq.

85. As a direct and proximate result of Defendants' conduct, Karlsson suffered and will continue to suffer damages.

## COUNT III: RETALIATION

86. Karlsson restates each and every prior paragraph of this complaint, as if it were fully restated herein.

87. As a result of the Defendants' discriminatory conduct described above, Karlsson complained of the discrimination, harassment, and disparate treatment she was experiencing.

88. Subsequent to Karlsson's complaints to management about harassment, bullying, and disparate treatment toward her, Defendants took adverse employment actions against Karlsson, including, but not limited to, terminating her employment.

89. Defendant's actions were retaliatory in nature based on Karlsson's opposition to the unlawful discriminatory conduct.

90. Pursuant to R.C. § 4112 *et seq.*, it is an unlawful discriminatory practice to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice.

91. As a direct and proximate result of Defendants' retaliatory discrimination against and discharge of Karlsson, she has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

### COUNT IV: UNLAWFUL INTERFERENCE WITH FMLA RIGHTS

92. Karlsson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

93. Pursuant to 29 U.S.C. § 2601 *et seq*., covered employers are required to provide employees job-protected unpaid leave for qualified medical and family situations.

94. CAM is a covered employer under the FMLA.

95. Karlsson was an employee eligible for FMLA due to her severe health conditions (described *supra*).

96. During her employment, Karlsson qualified for and inquired about FMLA leave due to her disabilities.

97. During her employment with CAM, Karlsson was unable to receive FMLA benefits for her child's disabilities.

98. CAM intentionally terminated Karlsson's employment before her one-year timeline to avoid providing her with FMLA.

99. CAM's cited reason (or lack thereof) for Karlsson's termination was pretext.

100. CAM actually terminated Karlsson's employment to prevent her from gaining FMLA leave.

101. Defendant unlawfully interfered with Karlsson's exercise of her rights under the FMLA in violation of § 105 of the FMLA and § 825.220 of the FMLA regulations.

102. Defendant's refusal to provide Karlsson with information pertaining to FMLA leave and/or permit Karlsson to take FMLA leave violated and interfered with her FMLA rights.

103. As a direct and proximate result of Defendant's conduct, Karlsson suffered and will continue to suffer damages.

104. As a direct and proximate result of Defendant's conduct, Karlsson is entitled to all damages provided for in 29 U.S.C. § 2617, including liquidated damages, costs and reasonable attorneys' fees.

**COUNT IV: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**

105. Karlsson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

106. A clear public policy exists and is manifested in Ohio and federal statutes, including Governor DeWine's Stay-At-Home Order, the Family First Coronavirus Relief Act ("FFCRA"), R.C. § 4101.11 and/or § 4101.12, and/or administrative regulations, or in the common law, in favor of providing workers with a healthy and safe work environment, and against terminating an employee based on complaints of unsafe working conditions caused by the COVID-19 pandemic and/or other causes.

107. A clear public policy exists and is manifested in Ohio and federal statutes, including Governor DeWine's Stay-At-Home Order, the FFCRA, R.C. § 4101.11 and/or § 4101.12, and/or administrative regulations, or in the common law, in favor of providing workers with a healthy and safe work environment, and against terminating an employee based on the employee's quarantine for potential exposure to COVID-19.

108. Karlsson repeatedly made reports to Defendants about the unethical, unlawful, and/or policy-violating behavior that was going on there, including, but not limited to,

unsafe working conditions caused by unsafe working conditions related to the coronavirus pandemic and other things.

109. Additionally, Karlsson also had to quarantine for a potential COVID-19 exposure shortly before her termination.

110. Defendants' termination of Karlsson's employment jeopardizes these public policies by undermining the authority of Gubernatorial orders, federal relief policies, and state statutes.

111. Defendants' termination of Karlsson's employment was motivated by Karlsson's conduct related to these public policies because of the risk to her and to the public's health.

112. Defendants' purported reason for Karlsson's termination was pretextual.

113. Defendants actually terminated Karlsson's employment due to her use of COVID-19 quarantine time off.

114. Defendants' termination of Karlsson jeopardizes these public policies.

115. Defendants' termination of Karlsson was motivated by conduct related to these public policies.

116. Defendants had no overriding business justification for terminating Karlsson.

117. As a direct and proximate result of Defendants' conduct, Karlsson has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## **DEMAND FOR RELIEF**

WHEREFORE, Karlsson demands from Defendant the following:

a) Issue a permanent injunction:

   i. Requiring Defendant to abolish discrimination, harassment, and retaliation;

    ii.    Requiring allocation of significant funding and trained staff to implement all changes within two years;

    iii.    Requiring removal or demotion of all supervisors who have engaged in discrimination, harassment, or retaliation, and failed to meet their legal responsibility to promptly investigate complaints and/or take effective action to stop and deter prohibited personnel practices against employees;

    iv.    Creating a process for the prompt investigation of discrimination, harassment, or retaliation complaints; and

    v.    Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;

b) Issue an order requiring Defendant to expunge her personnel file of all negative documentation;

c) An award against each Defendant for compensatory and monetary damages to compensate Karlsson for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

d) An award of punitive damages against each Defendant in an amount in excess of $25,000;

e) An award of reasonable attorneys' fees and non-taxable costs for Karlsson's claims as allowable under law;

f) An award of the taxable costs of this action; and

g) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

*/s/ Matthew G. Bruce, Esq.*
Matthew G. Bruce (0083769)
    Trial Attorney
Evan R. McFarland (0096953)
**THE SPITZ LAW FIRM, LLC**
Spectrum Office Tower
11260 Chester Road, Suite 825
Cincinnati, Ohio 45246
Phone: (216) 291-0244 x173
Fax:   (216) 291-5744
Email: Matthew.Bruce@SpitzLawFirm.com
Email: Evan.McFarland@SpitzLawFirm.com

*Attorneys for Plaintiff Anita Karlsson*

## JURY DEMAND

Plaintiff Anita Karlsson demands a trial by jury by the maximum number of jurors permitted.

*/s/ Matthew G. Bruce, Esq.*
Matthew G. Bruce (0083769)

14