**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| ANITA KARLSSON, | : | |
| *Plaintiff*, | : | Case No. 1:21-cv-257 |
| v. | : | Judge Jeffery P. Hopkins |
| CARGO AIRCRAFT MANAGEMENT, INC., *et al.*, | : | |
| *Defendants*. | : | |

---

### OPINION AND ORDER

---

Plaintiff Anita Karlsson ("Plaintiff" or "Karlsson") is a former employee of Defendant Cargo Aircraft Management, Inc. ("Cargo Aircraft"). While there, she worked alongside Defendants Jonathan Swetnam ("Swetnam") and Brady Templeton ("Templeton"). During her brief tenure, Karlsson weathered the start of a global pandemic as a single mother with two minor children, navigated her minor daughter's cancer diagnosis and treatment, and suffered the loss of a parent. After overcoming these life challenges, Karlsson faced another when she was terminated from her job.

In relation to her employment and subsequent termination, Karlsson alleges that she suffered disability and gender discrimination, retaliation, interference with her rights under the Family and Medical Leave Act, and wrongful termination. She now seeks to hold Cargo Aircraft, Swetnam, and Templeton (collectively, "Defendants") accountable for what took place. Defendants disclaim liability and ask the Court for summary judgment.

For the reasons below, Defendants' Motion for Summary Judgment (Doc. 17) is **GRANTED** in part and **DENIED** in part.

## I.    BACKGROUND

This case centers around Plaintiff Anita Karlsson's employment at, and termination from, Cargo Aircraft. Karlsson began working at Cargo Aircraft as an Asset Manager on April 1, 2020, near the start of the COVID-19 pandemic. Compl., Doc. 1, ¶ 22; Karlsson Dep., Doc. 13, 44:7–9. At the beginning of her employment, Karlsson worked in the office each day, while other employees worked remotely. *Id.* at 45:21–46:4. Karlsson worked directly under Defendant Jonathan Swetnam, and Swetnam worked directly under Defendant Brady Templeton. Karlsson Dep., Doc. 13, 44:19–23. She worked in close proximity to Swetnam and Templeton and interacted with them regularly at work. *Id.* at 46:5–24. Though both Swetnam and Templeton are named individually in Karlsson's Complaint, most of the events that lay the basis for her claims focus on her interactions with Swetnam.

### A. Gender-Related Harassment Allegations

A few months into her tenure, Karlsson complained to management about Swetnam's behavior. *Id.* at 57:7–21. She allegedly reported that Swetnam spoke to her, primarily through email correspondence, in a harassing manner. *Id.* at 57:22–58:1. When asked about the nature of the harassment, Karlsson complained that Swetnam would ask for a "quick summary" on the status of matters relating to her role as an Asset Manager—but according to Karlsson, there was no quick explanation to be had. Instead, Karlsson testified that she would have to provide exhaustive detail of the status of inventory for Swetnam to understand. *Id.* at 61:18–62:16. She recalled Swetnam telling her that he was "a bit tired of having to chase [her] down for answers," to which Karlsson replied that she felt like his behavior was "harassment" because she was providing Swetnam everything that he had asked for. *Id.* at 62:11–16.

Karlsson first complained about Swetnam to Templeton. *Id.* Later she elevated her concerns to Human Resources, though she testified that when she spoke with Human Resources, Karlsson could not speak freely because Swetnam was present. *Id.* at 58:16–19. When she discussed her complaint with management, she explained that Swetnam's demands were "requiring [her] to work up to 17 hours a day." *Id.* at 65:10–19. Yet despite her complaints, Karlsson testified that there was no resolution. *Id.* at 65:24–66:9. Karlsson conceded that she did not make any further attempts to contact Human Resources or make additional complaints about Swetnam during her tenure. *Id.* And although Karlsson alleges in her Complaint that Swetnam harassed her because she was female, *see, e.g.*, Compl., Doc. 1, ¶ 75–85, there is no evidence that she expressly tied her harassment complaints to gender.

Beyond the behavior that she complained about to Templeton and management, Karlsson also testified that Swetnam would repeatedly "yell" for her to come to his office. Karlsson Dep., Doc. 13, 207:11–15. According to Karlsson, Swetnam did not treat her male counterparts in the same manner, though she did not complain about this behavior while employed at Cargo Aircraft. *Id.* at 207:14–15; 209:16–210:1.

### B.  Disability-Related Harassment Allegations

Around the time Karlsson reported Swetnam's harassment, Karlsson became ill with a sinus infection and worked remotely while she awaited the results of a COVID-19 test. She testified that Swetnam sent frequent requests asking about her results. Karlsson Dep., Doc. 13, 85:1–86:7. He questioned her about when she was returning to work and told her that she was not supposed to be working if she was sick. *Id.* Karlsson, however, felt Swetnam was sending her mixed messages about whether she was supposed to be working. *Id.*

To compound the ongoing conflict between Karlsson and Swetnam, Karlsson's daughter became severely ill. Her daughter was ultimately diagnosed with leukemia on September 29, 2020, following a one-month period of testing and evaluation. *Id.* at 91:12–14. Given her daughter's cancer diagnosis, Swetnam allowed Karlsson to continue working remotely. *Id.* at 91:15–21. She worked remotely for the remainder of her time at Cargo Aircraft. But Karlsson testified that over the next several months, Swetnam continued to berate her about her plans for returning to the office and for updates about her daughter's condition. *Id.* at 91:22–92:16. Then, another unfortunate event occurred: Karlsson suffered the loss of her father, who passed away in October 2020. *Id.* at 92:17–93:7. This caused her to miss a week of work and upon her return, Swetnam continued to probe her about her return to working at the office and the status of her work responsibilities. *Id.* at 93:1–14. Karlsson testified that Swetnam's persistent questions about her returning to the office continued through the remainder of her employment at Cargo Aircraft. *Id.* at 96:10–24. Karlsson considered Swetnam's habit of asking about her return to the office harassment because "[her] daughter was still critically ill, and there was active COVID on site every day, which compromised her, since she had zero immune system and [Karlsson] was the only parent." *Id.* at 97:12–17.

Through all of this, Karlsson was not eligible for FMLA leave because she had yet to surpass one year of employment. *Id.* at 91:2–10.

### C. Karlsson's Termination

In a culmination of sorts, Karlsson was ultimately terminated by Cargo Aircraft— though both parties strenuously dispute when Karlsson's termination occurred. Karlsson contends that she was terminated on March 9, 2021, in accordance with a severance letter

that she received. Steve Sager, Director of Human Resources, emailed a copy of the severance letter to Karlsson on March 9, 2021. Karlsson Dep., Doc. 13-8, Def. Ex. 8, PageID 360. The relevant paragraphs of the severance letter Sager sent Karlsson read as follows:

> This letter sets forth the terms of an offer by Cargo Aircraft Management (CAM), of financial benefits should you agree to the terms set forth below. Please read this letter carefully, as it contains all of the terms and conditions of this agreement.
>
> > 1. Your last day of employment with CAM is March 9, 2021. After this date, you are no longer authorized to incur any expenses or obligations on behalf of CAM or to represent yourself as an employee or person authorized to act on behalf of CAM, whether or not you execute this Agreement.

*Id.* at PageID 361. Karlsson testified that she understood the letter to mean that her last day as an employee for Cargo Aircraft was March 9, 2021, "regardless of whether [she] accepted [the severance agreement] or not." Karlsson Dep., Doc. 13, 153:1–15; *see also id.* at 149:12–151:7. Karlsson did not accept the agreement.

Cargo Aircraft, on the other hand, takes quite an opposite approach to the meaning of the severance letter. Cargo Aircraft maintains that the letter Sager emailed to Karlsson on March 9, 2021 did not terminate her as of that date, rather Karlsson was terminated months later, on June 16, 2021, after she abandoned her employment. *Id.* at 171:23–172:5. Cargo Aircraft has cited continued efforts to contact Karlsson to discuss what they say was merely a severance *offer*. At the same time, Karlson testified that she did not attempt to access her company computer or Cargo Aircraft systems, nor contact any Defendants after she received the severance letter. *Id.* at 156:10–16. Karlsson did not respond to emails that Cargo Aircraft sent to her personal email about being placed on a medical leave of absence. *Id.* at 160:6–161:11. Karlsson also did not apply for family medical leave despite being advised of her eligibility to do so. *Id.* at 162:3–18. And although Karlsson continued to receive

5

correspondence on her personal email regarding her status at the company, she did not respond and instead consulted her attorney when she received new correspondence. Throughout this period, Karlsson did not receive any pay from Cargo Aircraft because she had deleted her direct deposit information. *Id.* at 167:14–18.

In the matter now before the Court for review, Defendants have requested that this Court grant their Motion for Summary Judgment dismissing all Plaintiff's claims in their entirety. Doc. 17. By contrast, Karlsson maintains that genuine issues of material fact remain as to each element of her claims for disability discrimination in violation Ohio Revised Code § 4112.02(A) (Count I), gender discrimination in violation of Ohio Revised Code § 4112.02(A) (Count II), retaliation in violation of Ohio Revised Code § 4112.02(I) (Count III), interference with FMLA rights (Count IV), and wrongful termination in violation of public policy (Count V), and that Defendants' Motion should therefore be denied. Doc. 24. Following the filing of Defendants' Reply (Doc. 25), the matter is now ripe for determination.

## II.    STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "'always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d

6

146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

The non-movant cannot defeat summary judgment merely by pointing to any factual dispute. Indeed, the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). A fact is material if its resolution affects the outcome of an action, and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. At bottom, the Court must determine whether there is some "sufficient disagreement" that necessitates submitting the matter to a jury. *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52).

## III.   LAW AND ANALYSIS

To recap, Karlsson, in her Complaint, seeks to recover monetary relief from Defendants for employment discrimination under five claims: disability and gender discrimination and retaliation all in violation of O.R.C. § 4112 *et seq.* (Counts I, II, III), interference with her rights under the Family and Medical Leave Act ("FMLA") (Count IV), and wrongful termination in violation of public policy (Count V). Compl., Doc. 1, ¶¶ 66–117. Defendants seek summary judgment on all of Karlsson's claims. Doc. 17.

### A. Associational Disability Discrimination (Count I)

The Court turns first to Karlsson's claim for associational disability discrimination under Ohio law. For this claim, Karlsson alleges that Defendants discriminated against her

because of her daughter's disability: Karlsson's daughter was diagnosed in September 2020 with leukemia.

### 1. Claim as Asserted against Swetnam and Templeton

Before turning to the substance of Karlsson's claim, the Court will first address Defendants' contention that Swetnam and Templeton, as individuals, cannot be held liable as an "employer" under § 4112.02(A) based on developments in the case law.[1] Doc. 17, PageID 700. Karlsson does not address this argument.

Consistent with Defendants' position, there has been an evolution of sorts in Ohio courts regarding individual liability under § 4112.02(A). The Ohio Supreme Court determined in *Genaro v. Cent. Transp., Inc.*, 84 Ohio St.3d 293, 296 (1999) that the "definition of 'employer,' by its very terms, encompasses individual supervisors and managers whose conduct violates the provisions of R.C. Chapter 4112." The Ohio Supreme Court later brought this doctrine into question in *Hauser v. Dayton Police Dep't*, 140 Ohio St.3d 268, 270 (2014) when that same court decided that § 4112.01(A)(2) and § 4112.02(A) "do not expressly impose civil liability on political-subdivision employees." Although the *Hauser* court admitted that "[its] reasoning in [the] case calls the *Genaro* majority's reasoning into question," the *Hauser* court elected to distinguish *Genaro* rather than overrule it. *Id.* at 273–74. In the years since these cases were decided, however, many federal courts in this District and the Northern

---

[1] The Ohio General Assembly amended Chapter 4112 to eliminate supervisor culpability for some employment discrimination claims, with an effective date of April 15, 2021. Ohio Rev. Code § 4112.08 (effective Apr. 15, 2021) ("[N]o person has a cause of action or claim based on an unlawful discriminatory practice relating to employment described in division (A)(24)(a) of section 4112.01 of the Revised Code against a supervisor, manager, or other employee of an employer unless that supervisor, manager, or other employee is the employer."); *see also* Sub. H.B. 352, 133d Gen. Assemb. (Ohio 2020). Courts in the Southern District of Ohio and the Northern District of Ohio have determined that the amended language only applies prospectively, not retroactively. *See e.g.*, *Norman v. RK Holdings, LLP*, No. 2:22-cv-03704, 2025 WL 934223, at *3 (S.D. Ohio Mar. 27, 2025); *Williams v. Barton Malow Co.*, 581 F. Supp. 3d 923, 927–28 (N.D. Ohio 2022). Based on her allegations, Karlsson's claim accrued before April 15, 2021.

District of Ohio have ruled that *Hauser's* holding bars individual liability for private- and public-sector employees. *Parker v. Strawser Constr., Inc.*, 307 F. Supp. 3d 744, 752 (S.D. Ohio 2018) (collecting cases). Following the lead of those courts and absent argument from Plaintiff to the contrary, this Court too finds that *Hauser's* reasoning extends to individual liability against supervisors in the private sector. Accordingly, the § 4112.02(A) discrimination claims asserted against Swetnam and Templeton in their capacity as an "employer" are no longer viable, and the Court will proceed to consider Karlsson's discrimination claims against Cargo Aircraft only.[2]

### 2. Claim as Asserted against Cargo Aircraft

With individual liability claims against Swetnam and Templeton resolved, the Court will now address the substance of Karlsson's claim. Cargo Aircraft adamantly opposes Karlsson's claim on the basis that Ohio law does not recognize associational disability discrimination claims.

In Ohio, it is unlawful for "any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause" or "otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." O.R.C. § 4112.02(A). The question now becomes, does this provision extend to associational disability discrimination claims? Seemingly so, according to the Sixth Circuit.

---

[2] Defendants also contend that Swetnam and Templeton cannot be held liable under § 4112.02(I) for retaliation. Doc. 17, PageID 705. There is a key difference between § 4112.02(A) and § 4112.02(I) that signals *Hauser* does not extend to § 4112.02(I) in the manner that Defendants suggest: subsection (I) applies to "persons" not "employers." *See Hauser*, 17 N.E.3d at 273 ("An individual political-subdivision employee still faces liability under other provisions of [§] 4112.02 that expressly impose liability, including the aiding-and-abetting provision in [§] 4112.02(J)."). In any case, the Court need not exhaust that issue here because, as discussed below, Defendants are still entitled to summary judgment on Karlsson's retaliation claim.

To this Court's benefit, after briefing was completed in this case, the Sixth Circuit addressed this question in *Chapman v. Brentlinger Enters.*, 124 F.4th 382, 406–07 (6th Cir. 2024). In deciding whether § 4112.02(A) encompasses associational disability discrimination claims, the Sixth Circuit relied on the Ohio Supreme Court's decision in *Ohio Civ. Rts. Comm. v. Lysyj*, 38 Ohio St.2d 217, 221 (1974). There, the Ohio Supreme Court interpreted a different but analogous subsection of § 4112.02, and concluded that § 4112.02(G), which outlaws discrimination in public accommodations, provides a cause of action for associational claims. *Id.* at 221. Drawing from that conclusion, the Sixth Circuit predicts that the Ohio Supreme Court will interpret § 4112.02(A) in the same manner as § 4112.02(G), just like other Ohio courts have, including for example, Ohio's First District Court of Appeals in *Cole v. Seafare Ent. Ltd., Inc.*, 1996 WL 60970, at *2 (1st Dist. Feb. 14, 1996). *Chapman*, 124 F.4th at 406–07; *see, e.g.*, *Easter v. Beacon Tri-State Staffing, Inc.*, No. 2:17-cv-197, 2019 WL 4737694, at *8 (S.D. Ohio Sept. 27, 2019) (collecting cases)*; Maxwell v. City of Columbus*, No. 2:08-cv-264, 2011 WL 2493525, at *4 (S.D. Ohio June 21, 2011). The Sixth Circuit in *Chapman* also expressly rejected the unpublished Sixth Circuit decisions upon which Cargo Aircraft relies, explaining that neither *Smith v. Hinkle Mfg., Inc.*, 36 F. App'x 825, 830–31 (6th Cir. 2002) nor *Kepreos v. Alcon Lab'ys, Inc.*, 520 F. App'x 375, 376 (6th Cir. 2013) "address *Lysyj* or *Cole*—or indeed, any Ohio state court decision." *Chapman*, 124 F.4th at 406. Thus, taking into consideration *Chapman*, and the state court decisions the Circuit relied on in that opinion, this Court finds that Karlsson may advance an associational disability discrimination claim under Ohio law.

That tees up the merits of Karlsson's associational disability discrimination claim. Disability discrimination claims, whether brought under the ADA or Ohio law, are analyzed in the same manner. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 872 (6th Cir. 2007). The

Sixth Circuit recognizes three associational disability theories: (1) expense, (2) disability by association, and (3) distraction. *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 487 (6th Cir. 2011)). Though Karlsson does not expressly identify the theory on which she is proceeding, it is safe to assume that Karlsson's claim falls within the bounds of the distraction theory. Reliance on the distraction theory means that an employee's inattentiveness at work is caused by the disability of someone with whom that employee is associated. *Id.*

To defeat summary judgment on an associational disability-based termination claim, Karlsson must present direct or indirect (*i.e.*, circumstantial) evidence that would allow a trier of fact to find that Cargo Aircraft intentionally discriminated against Karlsson because of her associational disability. *Talley v. Fam. Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008). "Direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated, at least in part, by unlawful discrimination." *Igwe v. Salvation Army*, 790 F. App'x 28, 34 (6th Cir. 2019) (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003)). Where, as here, there is no direct evidence, the *McDonnell Douglas* burden-shifting framework applies. *See Talley*, 542 F.3d at 1105; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). That framework requires Karlsson to first establish a prima facie case of discrimination. *Talley*, 542 F.3d at 1105.

To establish a prima facie case of associational disability discrimination under Ohio law, Karlsson must show that "(1) [she] was qualified for [her] position; (2) [she] suffered an adverse employment action; (3) [her] employer knew that [she] had a relative with a disability; and (4) the circumstances of the adverse employment action raise a reasonable inference that the relative's disability was a determining factor in the decision." *Holmes v. Ke Gutridge, LLC*,

11

No. 2:22-cv-1694, 2025 WL 908407, at *14 (S.D. Ohio Mar. 26, 2025) (citing *Stansberry*, 651 F.3d at 487). If Karlsson successfully establishes a prima facie case, the burden shifts to Defendants "to articulate some legitimate, nondiscriminatory reason" for its actions. *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001) (quoting *McDonnell Douglas*, 411 U.S. at 802). If Defendants succeed in doing so, the burden shifts back to Karlsson to show that the proffered reason was not the true reason for her termination, but merely a pretext for discrimination. *Talley*, 542 F.3d at 1105.

For purposes of a prima facie case, Cargo Aircraft does not outwardly contest the first and third factors: (1) that Karlsson was qualified for her position and (3) that she was known to be associated with a disabled individual. Thus, the Court will focus its efforts on factors two and four: (2) whether Karlsson has shown that she suffered an adverse employment action and if so, (4) whether the circumstances of such action raise a reasonable inference that her daughter's disability (*i.e.*, cancer diagnosis) was a determining factor in the adverse action.

As to the former, Cargo Aircraft argues that Karlsson cannot show that she suffered an adverse employment action because Karlsson was not terminated. Doc. 17, PageID 699. Instead, Cargo Aircraft claims that Karlsson abandoned her position after Cargo Aircraft made her a severance "offer," and then "made multiple and sustained efforts to communicate with Karlsson." *Id.* Based on the opening phrase, it would seem like the severance letter was just that, an offer, and not termination: "This letter sets forth the terms of an offer by Cargo Aircraft Management (CAM) of financial benefits should you agree to the terms set forth below." Karlsson Dep., Doc. 13-8, Def. Ex. 8, PageID 361. But this phrase cannot be viewed in isolation, and must instead be considered against the first term of the severance agreement:

> Your last day of employment with CAM is March 9, 2021. After this date, you are no longer authorized to incur any expenses or obligations on behalf of CAM

> or to represent yourself to anyone as an employee or person authorized to act
> on behalf of CAM, *whether or not you execute this Agreement*.

*Id.* (emphasis added). Based on this term, a reasonable jury could find it was not unreasonable for Karlsson to believe that she had been terminated. Indeed, Karlsson testified consistently and repeatedly that, as she understood the severance letter, her last day as an employee for Cargo Aircraft was March 9, 2021, "regardless of whether [she] accepted [the severance agreement] or not." Karlsson Dep., Doc. 13, 153:1–15; *see also id.* at 149:12–151:7. Karlsson did not accept the agreement.

After receiving the severance letter, Karlsson did not make any attempts to access her company computer or Cargo Aircraft systems, nor contact any Defendants. *Id.* at 156:10–16. When she started to receive, via her personal email, emails from Cargo Aircraft about being placed on a medical leave of absence, Karlsson did not respond. *Id.* at 160:6–161:11. Karlsson also did not apply for family medical leave despite being advised of her eligibility to do so because, according to the severance letter, she "was no longer an employee." *Id.* at 162:3–18. Karlsson continued to receive correspondence from Cargo Aircraft on her personal email regarding her status at the company. She did not respond and instead consulted her attorney each time she received new correspondence. All this time, Karlsson was not being paid by Cargo Aircraft because she had deleted her direct deposit information. *Id.* at 167:14–18.

Cargo Aircraft maintains that continued efforts to contact Karlsson to discuss the severance offer and her employment demonstrate that Karlsson remained employed at Cargo Aircraft until she was deemed to have abandoned her employment on June 16, 2021. Doc. 17, PageID 699. To that end, Cargo Aircraft relies on *Watkins v. Hill's Pet Nutrition, Inc.*, 63 F. App'x 185 (6th Cir. 2003) to show that no reasonable jury could find that Karlsson had been terminated on March 9, 2021. *Id.* at PageID 700. Though the facts in *Watkins* are similar to

the facts here, there are certain distinguishing features that lend to a different outcome. In *Watkins*, the severance letter offered the plaintiff an opportunity to withdraw his request for severance by stating that the plaintiff in that case could, "return to work as normally scheduled [], and [] assume [his] regular duties." *Watkins*, 63 F. App'x at 187. For that reason, the Sixth Circuit found that no reasonable jury could find that the plaintiff had been terminated given that he could withdraw his request for severance and return to work. *Id.* Here, by contrast, the terms of Karlsson's severance provide for no opportunity to reject the agreement and return to her position.

The facts in *Pittington v. Great Smoky Mt. Lumberjack Feud, LLC*, 213 F. Supp. 3d 951 (E.D. Tenn. 2016) are likewise distinguishable. There, the plaintiff had been erroneously informed by her spouse, who worked for the same employer, that she had been fired. *Id.* at 961. Despite being told by her supervisor that she had not been terminated, the plaintiff stopped reporting to work. *Id.* Under these facts, the court found no evidence to support a finding that the plaintiff had been terminated. There is no way to square the facts in *Pittington* with the facts here. Though Cargo Aircraft attempts to analogize the efforts made by the employer in *Pittington* with Cargo Aircraft's actions post-severance letter, the terms of the severance letter make clear that Karlsson was to no longer represent herself as an employee of Cargo Aircraft after March 9, 2021—regardless of whether she executed the severance agreement. Thus, the events that occurred after Cargo Aircraft tendered the severance letter are insufficient to show the absence of a genuine factual dispute because Karlsson has alleged facts upon which a reasonable jury could find that Karlsson believed she had been terminated. Thus, construing the facts in Karlsson's favor, as the Court must at this stage, a reasonable jury could find that Karlsson suffered an adverse employment action.

14

Cargo Aircraft contends, in the alternative, that even if Karlsson suffered an adverse employment action, Karlsson has not offered evidence that shows the circumstances raise a reasonable inference that her daughter's disability was a determining factor in her termination. Doc. 17, PageID 699 n.2. When construing the evidence in a light most favorable to Karlsson, the Court finds otherwise. Karlsson was permitted to work remotely after and because of her daughter's diagnosis. Karlsson Dep., Doc. 13, 91:2–18. Karlsson, however, testified that Swetnam repeatedly "harassed" Karlsson about when she was returning to in-person work. *Id.* at 91:22–97:17. Karlsson took offense to his behavior because her daughter "was still critically ill, and there was active COVID on site every day, which compromised her, since she had zero immune system." *Id.* at 97:12–17. Karlsson was also the only parent. *Id.* Karlsson never returned to the office after her daughter's diagnosis in September 2020. *Id.* at 91:19–21.

In early March 2021, Swetnam emailed Karlsson to arrange an in-person meeting to discuss a future plan for her to potentially return to the office. Templeton Dep., Doc. 14, 59:5–23. Karlsson indicated she could not report to the office because her daughter had to remain in inpatient care for at least five weeks. *Id.* Four days later, Cargo Aircraft provided Karlsson with the severance letter that indicated her last day as an employee for Cargo Aircraft was March 9, 2021. Karlsson Dep., Doc. 13, 153:1–15. Based on this evidence, a reasonable jury could find that these circumstances raise a reasonable inference that Karlsson's daughter's disability was a determining factor given that her daughter's condition, particularly during the COVID pandemic, required remote work. Additionally, Templeton testified that one of the reasons Karlsson was offered severance was because "she wasn't coming to work."

15

Templeton Dep., Doc. 14, 23:18–24:10. Templeton acknowledged Karlsson was not coming to work because she was caring for her daughter and as a result of the "COVID situation." *Id.*

As a final point, Cargo Aircraft has not convinced the Court that the time between Karlsson's termination and Cargo Aircraft's knowledge of her daughter's diagnosis weaken the inference that the two situations are related. The defendant-employer in *Stansberry* (a case cited by Cargo Aircraft) had known for many *years* that the plaintiff's wife was ill, and this extended period of time undercut "the inference that Stansberry's termination was based on unfounded fears that his wife's disability might cause him to be inattentive at work." *Stansberry*, 651 F.3d at 488. But here, Cargo Aircraft had been aware of Karlsson's daughter's disability for only a few months. Her daughter was diagnosed on September 29, 2020—less than six months before Karlsson's termination. Karlsson Dep., Doc. 13, 66:10–14. Karlsson has thus established a prima facie case for her associational disability discrimination claim.

The second prong of the *McDonnell Douglas* test requires this Court to evaluate Cargo Aircraft's proffered nondiscriminatory reasons for Karlsson's termination. "This is merely a burden of production, not of persuasion, and it does not involve a credibility assessment." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009) (citing *Bd. of Trs. of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 n.2 (1978) (explaining the employer satisfies its burden if it explains its actions or produces evidence of legitimate nondiscriminatory reasons)). Here, Cargo Aircraft adamantly maintains that Karlsson was not terminated as of the date set forth in the March 9 severance letter, and that she was terminated months later on June 16 for job abandonment. Doc. 17, PageID 699–700. Even though Cargo Aircraft acknowledges that it made a severance offer to Karlsson, Cargo Aircraft does not attempt to explain why it took such action. In support of its Motion, Cargo Aircraft cites no other reason for Karlsson's

termination beyond job abandonment. As stated previously, a reasonable jury could find that Karlsson suffered an adverse employment action before Karlsson's alleged job abandonment. Thus, because Cargo Aircraft offers no other reason for Karlsson's termination in its Motion, the Court finds that Cargo Aircraft has not produced a legitimate, non-discriminatory reason for Karlsson's termination. Cargo Aircraft is not entitled to summary judgment on Karlsson's associational disability discrimination claim.

### B. Gender Discrimination (Count II)

Next, the Court considers Karlsson's gender discrimination claim, which is asserted against Defendants. That said, for the reasons discussed earlier, such a claim is viable only as to Cargo Aircraft, and not against Swetnam and Templeton. *Parker*, 307 F. Supp. 3d at 752.

Because there is no direct evidence of gender discrimination, the same burden shifting framework applies to this claim. *McDonnell Douglas*, 411 U.S. at 802. This means that Karlsson must first establish a prima facie case of gender discrimination by showing that (1) she was qualified for her position; (2) she suffered an adverse employment action; (3) she was a member of a protected class; and (4) she was replaced by a person outside the protected class or treated differently than similarly situated employees of a different gender. If she does, the burden shifts once again to Cargo Aircraft "to articulate some legitimate, nondiscriminatory reason." *Id*. If that is accomplished, the burden shifts back to Karlsson to show that the proffered reason was pretextual.

Karlsson satisfies the first three prongs of a prima facie case with ease: (1) she was qualified for her position, (2) a reasonable jury could find that she suffered an adverse employment action, and (3) she is female, and thus a member of a protected class. That leaves whether she was replaced by someone outside the protected class or treated differently than

similarly situated employees of a different gender. As to this prong, Karlsson alleges that she was replaced by someone outside her protected class—a male, Mohammed Zerguit—who began employment on May 10, 2021, and assumed all Karlsson's duties. Doc. 24, PageID 797 (citing Doc. 24-1, PageID 817–18).[3]

Cargo Aircraft argues that Karlsson has not met her burden as to this prong for two reasons: (1) Mr. Zerguit was hired before Karlsson's termination so he could not have replaced her and (2) Karlsson has produced no evidence showing Mr. Zerguit was treated more favorably than her. Doc. 25, PageID 848. Both of these assertions, however, assume that Karlsson suffered an adverse employment action on June 16, 2021, which is when Cargo Aircraft contends Karlsson was terminated for abandonment. But as discussed earlier, a reasonable jury could find that Karlsson suffered an adverse action at the time she received the severance letter—months before on March 9. Both of Cargo Aircraft's arguments must therefore be rejected when viewing the evidence in the light most favorable to Karlsson, as we must at this stage in the proceeding.

Additionally, although Cargo Aircraft states that Karlsson was not replaced, Cargo Aircraft indicates that Karlsson's duties were assumed by Mr. Zerguit. Doc. 24-1, PageID 817–18. Generally, "a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990). Here, there is no evidence before the Court to suggest that

---

[3] Karlsson erroneously states that Mr. Zerguit was hired on March 10, 2021. Defendants' interrogatory answer that Karlsson relies on states that Mr. Zerguit was hired on May 10, 2021.

18

Mr. Zerguit had additional duties beyond those assigned to Karlsson. Additionally, because a reasonable jury could find that Karlsson suffered an adverse employment action before Mr. Zerguit had been hired, a reasonable jury could also find that Mr. Zerguit, a person outside of Karlsson's protected class, was hired to replace Karlsson as he assumed her duties. Karlsson has thus met her burden of establishing a prima facie case of gender discrimination.

That places the burden on Cargo Aircraft to set forth legitimate, non-discriminatory reasons for its actions. But as with the previous claim, Cargo Aircraft cites no other reason for Karlsson's termination beyond job abandonment. Thus, for the reasons stated earlier, the Court finds that Cargo Aircraft has not produced a legitimate, non-discriminatory reason for Karlsson's termination. Cargo Aircraft is not entitled to summary judgment on this claim.[4]

## C. Retaliation (Count III)

That brings the Court to Karlsson's retaliation claim. According to Karlsson, this claim "stems from the adverse actions she endured after she reported harassment by Swetnam and requested an accommodation based on her daughter's disability." Doc. 24, PageID 799.

Ohio law prohibits "any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section . . . ." O.R.C. § 4112.02(I). Because this statutory language mirrors that of its federal counterpart, Ohio courts routinely hold that "[f]ederal law provides the applicable analysis for reviewing retaliation claims" brought under § 4112.02(I). *Braun v. Ultimate Jetcharters, LLC*,

---

[4] As a precaution, Cargo Aircraft, in its Motion, explores the contours of a hostile work environment claim in the context of gender based on Karlsson's deposition testimony. Doc. 17, PageID 701 n.5 (citing Karlsson Dep., Doc. 13). In response to the Motion, Karlsson does not attempt to advance a hostile work environment claim, nor address Cargo Aircraft's arguments against such a claim. Because there is no evidence beyond the deposition testimony to suggest that Karlsson is proceeding on a hostile work environment claim, in her Complaint or otherwise, the Court declines to address it.

828 F.3d 501, 510 (6th Cir. 2016) (quoting *Baker v. Buschman Co.*, 127 Ohio App. 3d 561, 568 (12th Dist. 1998)); *see also Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civ. Rts. Comm'n*, 66 Ohio St. 2d 192, 196 (1981) ("[F]ederal case law interpreting Title VII . . . is generally applicable to cases involving alleged violations of [O.R.C.] Chapter 4112.").

Karlsson has offered no direct evidence of retaliation, so the framework for a claim under § 4112.02(I) is the same as Karlsson's associational disability and gender discrimination claims. *See McDonnell Douglas*, 411 U.S. at 802. Karlsson must first establish a prima facie case of retaliation by showing that (1) she engaged in a protected activity, (2) the protected activity was known to Defendants, (3) Defendants took adverse employment action against Karlsson, and (4) there is a sufficient causal connection between the protected activity and the adverse action. *Smith v. City of Salem*, 378 F.3d 566, 570 (6th Cir. 2004). If she does so, then the burden shifts to Defendants to articulate a legitimate non-discriminatory reason for discharge. If successful, Karlsson must show that Defendants' reasons were pretextual.

There are two ways for Karlsson to show the first prong, namely that she engaged in protected activity: (1) the opposition clause or (2) the participation clause. *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (6th Cir. 2012); *Braun*, 828 F.3d at 511–12. Under the "opposition clause," it is unlawful for an employer to retaliate when an employee has "opposed any unlawful discriminatory practice." O.R.C. § 4112.02(I). On the other hand, under the "participation clause," it is unlawful for an employer to retaliate when an employee has "has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing." *Id*. Here, Karlsson's claim arises under the former. Doc. 24, PageID 799–801.

20

Karlsson asserts that she "engaged in protected conduct when she submitted two separate complaints" to management regarding gender harassment by Swetnam. Doc. 24, PageID 801. She also asserts that she "engaged in protected activity when she opposed Swetnam's pressure to work in the office in contravention of her accommodation of working remotely based on her associated disability." *Id.* The Court will start with the former.

Karlsson testified that she made her first complaint during a conversation with Templeton and then a second complaint during a conversation with Steve Sager, HR, and another woman identified as "Kim." Karlsson Dep., Doc. 13, 58:2–60:14. Karlsson's testimony, viewed charitably, is that she reported that Swetnam was engaging in harassing behavior. *Id.* Neither Karlsson's testimony nor any of the evidence she propounds, however, suggests that she characterized or intimated to anyone that she believed this "harassment" was related to her gender. For activity to be protected, an employee "must make it clear that she is opposing discrimination against a protected class." *Scheske v. Univ. of Mich. Health Sys.*, 59 F. Supp. 3d 820, 827 (E.D. Mich. 2014) (citing *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 373 (6th Cir. 2013)). Though she argues that a reasonable juror could "connect the dots," Doc. 24, PageID 801, the record is devoid of evidence that would permit a reasonable juror to draw an inference that she complained of gender bias based on facts so attenuated as this. At bottom, "general 'complaints to management,'" such as those at issue here, "do not constitute protected activity when the plaintiff does not 'object[] to discriminatory conduct against her based on her membership in a protected class.'" *Jenkins v. Regents of the Univ. of Mich. Health Sys.*, 763 F. App'x 545, 552 (6th Cir. 2019) (first alteration in original) (quoting *Braun*, 828 F.3d at 511).

21

Her second assertion suffers the same fate. Karlsson alleges that she engaged in protected activity when she opposed Swetnam's pressure to work in the office in contravention of her associational disability accommodation. But as to her retaliation claim, Karlsson only cites evidence of complaints that predated her daughter's diagnosis. She does not offer any evidence of complaints made after her daughter's diagnosis. Ordinarily, "[a] district court has no duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Parsons v. FedEx Corp.*, 360 F. App'x 642, 646 (6th Cir. 2010). Even so, the Court noted Karlsson's testimony that Swetnam "harassed" her about returning to in-person work. Karlsson Dep., Doc. 13, 91:22–99:2. Although she testified that she complained to Trisha McIntire, an employee of subsidiary ABX Air, about Swetnam's behavior, Karlsson did not testify about doing the same to anyone at Cargo Aircraft. And, even if Ms. McIntire were found to be an appropriate party to whom Karlsson could direct her complaint, there is no evidence that Karlsson adequately objected to Swetnam's conduct based on her membership in a protected class. *Jenkins*, 763 F. App'x at 552. As a result, Karlsson has failed to create a genuine issue of material fact such that she would satisfy the protected activity prong for establishing a prima facie case under *McDonnell Douglas.* Defendants are therefore entitled to summary judgment on Karlsson's retaliation claim.

### D. Interference with FMLA Rights (Count IV)

Karlsson also asserts a claim under the FMLA. There are two theories of recovery under the FMLA: interference and retaliation. Karlsson's claim is brought under the former theory, interference, which "arises when an employee is wrongfully denied a substantive entitlement—for example, the employee is denied leave to which she is entitled." *Milman v. Fieger & Fieger, P.C.*, 58 F.4th 860, 866 (6th Cir. 2023). For an interference claim, Karlsson

"need not show that [she] was treated worse than other employees, just that [she] was denied an entitlement under the Act." *Hoge v. Honda of Am. Mfg.*, 384 F.3d 238, 244 (6th Cir. 2004).

It is well established in the Sixth Circuit that an individual must qualify as an "eligible" employee as defined in 29 U.S.C. § 2611(2)(A) to pursue an interference or retaliation claim under the FMLA. *Banerjee v. Univ. of Tenn.*, 820 F. App'x 322, 327 (6th Cir. 2020); *Davis v. Mich. Bell Tel. Co.*, 543 F.3d 345, 350 (6th Cir. 2008) ("[A]n employee's ineligibility precludes the employee from pursuing an FMLA interference claim."). An employee is eligible if they have been employed for at least 12 months and have worked at least 1,250 hours during the preceding 12 months. 29 U.S.C. § 2611(2)(A). Here, Karlsson had not yet attained 12 months of employment as of March 9, 2021, and moreover, she concedes that she was not eligible at that time. Doc. 24, PageID 804 ("[T]here is no dispute that Karlsson was soon to be an eligible employee. . ."). Nevertheless, Karlsson seeks to advance her theory of an interference claim on the basis that Cargo Aircraft would have known of her need to take FMLA leave as soon as she became eligible because Cargo Aircraft was informed of her daughter's circumstances.

Karlsson has not cited any cases that support the proposition that she can maintain an interference claim based on forthcoming eligibility for leave. *See Brown v. Avanade, Inc.*, No. 3:23-cv-00417, 2023 U.S. Dist. LEXIS 211146 (M.D. Tenn. Nov. 28, 2023) (dismissing interference claim where the plaintiff was not an eligible employee). Nor is there any evidence in the record to suggest that Karlsson inquired about FMLA leave before her termination, or that she expressly notified Cargo Aircraft of her intent to take such leave once she had been employed for 12 months. *See, e.g.*, *Cross v. Dental Assisting Acad. of Louisville, LLC*, 417 F. Supp. 3d 836 (W.D. Ky. 2019) (finding that an employee who was fired just before meeting the 12-

23

month requirement, but who provided notice of intended leave to commence upon reaching 12 months, was protected under the FMLA).

Because there is no genuine dispute of material fact as to her eligibility for FMLA leave, Cargo Aircraft is entitled to summary judgment on Karlsson's interference claim.[5]

### E. Wrongful Termination (Count V)

In her fifth and final claim, Karlsson alleges wrongful termination in violation of Ohio public policy. To establish such a claim, Karlsson must show "(1) 'a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element)'; (2) dismissal 'under circumstances like those involved in [her] dismissal would jeopardize the public policy (the jeopardy element)'; (3) '[her] dismissal was motivated by conduct related to the public policy (the causation element)'; and (4) lack of an 'overriding legitimate business justification for the dismissal (the overriding justification element).'" *Hale v. Mercy Health Partners*, 617 F. App'x 395, 402 (6th Cir. 2015) (citing *Collins v. Rizkana*, 73 Ohio St.3d 65, 69–70 (1995)). "The first and second elements are questions of law for the court to decide, but the jury decides questions of fact relating to the latter two elements." *Id*. (citing *Collins*, 73 Ohio St.3d at 70).

The first prong, the clarity element, requires Karlsson to meet certain requirements: (1) Karlsson "must both *specifically* identify the sources, and also identify specific policies located within those specific sources, rather than make general assertions to broad policies," and (2) "the sources of the public policies must parallel Ohio's whistleblower statute (*i.e.*, a parallelism)." *Romero v. City of Middletown*, 479 F. Supp. 3d 660, 671–72 (S.D. Ohio 2020)

---

[5]  Even for this claim, Cargo Aircraft maintains that Karlsson was not terminated on March 9, 2021, so Cargo Aircraft seeks summary judgment on a different basis. At any rate, based on the Court's earlier findings about the severance letter, the Court views Karlsson's termination date as March 9, 2021.

(citing *Hale v. Mercy Health Partners*, 20 F. Supp. 3d 620, 639 (S.D. Ohio 2014); *Dean v. Consol. Equities Realty #3, LLC*, 2009-Ohio-2480, ¶ 11 (1st Dist.)). Karlsson can demonstrate parallelism if the source for the public policy on which she relies is of the type "designed to protect the public's health and safety." *Romero*, 479 F. Supp. 3d at 672.

Karlsson's public policy claim does not survive the clarity element. Karlsson alleges that she has satisfied the clarity element by pointing to two paragraphs in her Complaint:

> 106.  A clear public policy exists and is manifested in Ohio and federal statutes, including Governor DeWine's Stay-At-Home Order, the Family First Coronavirus Relief Act ("FFCRA"), R.C. § 4101.11 and/or § 4101.12, and/or administrative regulations, or in the common law, in favor of providing workers with a healthy and safe work environment, and against terminating an employee based on complaints of unsafe working conditions caused by the COVID-19 pandemic and/or other causes.

> 107.  A clear public policy exists and is manifested in Ohio and federal statutes, including Governor DeWine's Stay-At-Home Order, the FFCRA, R.C. § 4101.11 and/or § 4101.12, and/or administrative regulations, or in the common law, in favor of providing workers with a healthy and safe work environment, and against terminating an employee based on the employee's quarantine for potential exposure to COVID-19.

Compl., Doc. 1, ¶¶ 106–07. Within these paragraphs, she identifies four sources of public policy: (1) Governor DeWine's Stay-At-Home Order, (2) the Family First Coronavirus Relief Act ("FFCRA"), (3) O.R.C. § 4101.11, and (4) O.R.C. § 4101.12. Beyond these sources, Karlsson generally cites to "administrative regulations" and "common law." Karlsson's broad references are inadequate and require no analysis. *See, e.g.*, *Romero*, 479 F. Supp. 3d at 672–73 ("[B]roadly citing entire sections of the United States Code, or 'EPA regulations' at large, is not specific enough."). The focus then is on the four specifically-identified sources.

Take first Governor DeWine's Stay-At-Home Order. Though not clarified by the parties, the Court presumes that Karlsson is relying on the Stay At Home Order issued by the Director of the Ohio Department of Health. *See* Ohio Dep't of Health, Director's Stay At

25

Home Order (March 22, 2020) https://governor.ohio.gov/static/DirectorsOrderStayAt Home.pdf. Few courts have addressed the Stay At Home Order in the context of a wrongful termination in violation of public policy claim. In an unpublished state court decision, an Ohio common pleas court determined that the Stay At Home Order was an "appropriate source of law from which to derive a public policy." *Deluca v. Famous Distrib., Inc.*, C.P. No. CI-21-855, 7 (Jan 4, 2022). Subsequently, however, a court in this District concluded that even if the order did create a clear public policy, it would not be implicated to the extent that a party was terminated as a result of self-quarantine. *Carter v. RelaDyne Transp., LLC*, No. 1:22-cv-658, 2024 WL 3345737, at *8 (S.D. Ohio July 9, 2024) (citing *Deluca*, C.P. No. CI-21-855 at 7) ("[T]he *Deluca* Court found that the public policy in favor of containing COVID-19 did not extend to an employer's decisions related to an employee's self-quarantining.").

Karlsson, here, seeks to draw a policy argument related to the termination of an employee based on the employee's quarantine for potential exposure to COVID-19. As in *Carter*, this Court agrees that the Stay At Home Order does not establish a specific policy in that regard. To the extent that Karlsson seeks to derive a specific policy that addresses termination of an employee based on complaints of unsafe working conditions, she once again falters. Karlsson has not identified any policy within the order that would address that concern and instead cites generally to the order in its entirety. "Without citing a particular section or sections within [the Stay At Home Order], such references are simply too general to meet the specificity requirement for [her] claim." *Romero*, 479 F. Supp. 3d at 673.

The Court turns next to Karlsson's claim that the Families First Coronavirus Response Act ("FFCRA") provides another source of public policy. In *Walker v. Kraft Heinz Foods Co., LLC*, No. 1:22-cv-00316, 2022 WL 22716365, at *3 (S.D. Ohio Dec. 19, 2022), the district

26

court found that the plaintiff had failed to allege the clarity element as to the FFCRA for two reasons. First, the FFCRA, which was effective until December 31, 2020, expired before the plaintiff's illness and termination. *Id.* Second, the plaintiff had failed to allege or explain why an expired law constituted current public policy. *Id.* Here too, the FFCRA expired before Karlsson's termination. Further, Karlsson has not identified specific policies within the FFCRA that would support her wrongful termination claim.

Karlsson's remaining sources are O.R.C. § 4101.11 and O.R.C. § 4101.12. She cannot clear the clarity hurdle on these sources either. As the district court aptly explained in *Romero*, "while [§ 4101.11 and § 4101.12] are specific statutes, the Ohio courts that have considered those statutes have concluded that the policies reflected therein are 'very general and broad,' and thus the policies are not specific enough to satisfy the clarity element of a wrongful discharge in violation of public policy claim." 479 F.3d at 675 (citing *Whitaker v. First Energy Nuclear Operating Co.*, 2013-Ohio-3856, ¶ 25 (6th Dist.)). Thus, following the lead of *Romero* and the Ohio courts that have considered § 4101.11 and § 4101.12 in this context, this Court likewise finds that these statutes "do not appear to articulate any specific public policy of the type that would support a discharge in violation of public policy claim." *Id.*

Accordingly, because Karlsson has not satisfied the clarity element, Defendants are entitled to summary judgment on her wrongful termination claim.

## IV.    CONCLUSION

For the reasons stated, the Court **GRANTS** in part and **DENIES** in part Defendants' Motion for Summary Judgment (Doc. 17). Karlsson may proceed with her associational disability discrimination and gender discrimination claims (Counts I, II) against Cargo Aircraft. The Court will set this matter for a Telephone Status Conference by separate entry.

**IT IS SO ORDERED.**

March 13, 2026

Jeffery P. Hopkins
United States District Judge